IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MIKE JABARY | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 4:10-CV-711-MSH-ALM |
| CITY OF ALLEN, et al | § | |

# CITY OF ALLEN'S
# MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I. SUMMARY OF MOTION……………………………………………………………1

II. ISSUES TO BE DECIDED……………………………………………………………1

III. STATEMENT OF UNDISPUTED FACTS……………………………………………2

IV. ISSUE NO. 1 – RES JUDICATA OR COLLATERAL ESTOPPEL BAR ALL
    OF PLAINTIFF'S CLAIMS HEREIN……………………………………………………4

V. ISSUE NO. 2 - CLAIMS AGAINST THE CITY FAIL BECAUSE PLAINTIFF
   DOES NOT MEET MONELL REQUIREMENTS.............................................................10

   A. Description of Claims………………………………………………………..10
   B. Plaintiff Does Not Meet Requirements for a Civil Rights Claim Against the City….10

       1. Basic Facts Plaintiff Must Plead Against City………………………………..10
       2. Plaintiff Does Not Identify a Policymaker…………………………………..11
       3. Plaintiff Does Not Identify a Policy…………………………………………12

   C. Plaintiff Does Not Show a Civil Rights Violation Committed by Anyone………….13

VI. ISSUE NO. 3 – FAILURE OF THE TAKINGS CLAIM…………………………….14

   A. Description of Claim………………………………………………………..14
   B. The Takings Claim is Not Ripe……………………………………………..14

VII. ISSUE NO. 4 - THERE WAS NO VIOLATION OF PROCEDURAL
     DUE PROCESS………………………………………………………………16

   A. Overview of Procedural Due Process Claim…………………………………..16
   B. Availability of Hearing After the Fact Can Be Adequate…………………………17
   C. Public Health Or Safety Is An Exigency Allowing Hearing After the Fact…………20
   D. Competent Evidence Supporting Immediate Revocation…………………………22
       1. Health & Safety Problems With Food & Kitchen………………………………23
       2. Health & Safety Problems Regarding Product Being Sold – K-2……………25

   E. Conclusion As To Issue No. 4………………………………………………..28

VIII. ISSUE NOS. 5 & 6 – FAILURE OF SUBSTANTIVE OR SUBSTANTIAL DUE
      PROCESS CLAIMS……………………………………………………………28

   A. Identification of Claims…………………………………………………...28
   B. The Conclusory Nature of the Claims Requires Dismissal…………………………28
   C. No Egregious Conscience Shocking Conduct………………………………..29

IX. CONCLUSION…………………………………………………………………...30

# TABLE OF AUTHORITIES

STATUTES:

28 U.S.C. § 1738……………………………………………………………………………..4, 8

42 U.S.C. § 1983……………………………………………………………………………10

42 U.S.C. § 1985……………………………………………………………………………10

Article IV Section 1 of the United States Constitution……………………………………………4

Fed. R. Civ. P. 12(b)(6)……………………………………………………………………10, 11

Texas Local Government Code § 211.008……………………………………………14, 15, 19

Texas Local Government Code § 211.010………………………………………..4, 14, 15, 19, 21

CASES:

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)……………………………………………..10, 12, 14

Barr v. Resolution Trust Corporation, 837 S.W.2d 627, 631 (Tex. 1992)………………………..5

Barrow v. Greenville I.S.D., 2007 WL 3085028 at p. 9 (5th Cir. 2007)……………………..13, 29

Bennet v. City of Slidell, 728 F.2d 762, 769 (5th Cir. 1984)…………………………………11

Board of County Commissioners v. Brown, 520 U.S. 397, 403 (1997)…………………………11

Caine v. Hardy, 943 F.2d 1406, 1411-1412 (5th Cir. 1991)………………………………………...19

Catanzaro v. Weiden, 188 F.3d 56, 62-63 (2nd Cir. 1999)……………………………….........22

Chiras v. Miller, 432 F.3d 606, 611 (5th Cir. 2005)…………………………………………...11

City of Dallas v. Chicory Court Simpson Stewart, 271 S.W.3d 412, 421-423 (Tex. App. – Dallas 2008, rev. den. 2009)…………………………………………………………………..15

County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)…………………………..2, 29

Devenpeck v. Alford, 543 U.S. 146, 153 (2004)…………………………………………...27

Dimagio v. O'Brien, 497 F.Supp. 870, 876 (E.D. Pa. 1980)……………………………………10

Elsmere Park Club v. Town of Elsmere, 542 F.3d 412, 417-418 (3rd Cir. 2008)……………22, 25

_Free v. Abbott Labs, Inc._, 164 F.3d 270, 272 (5th Cir. 1999)…………………………………..13, 29

_Gilbert v. Homar_, 520 U.S. 924, 930 (1997)…………………………………………………...20, 25

_Green v. Tilley_, 2006 WL 220847 p. 3 (W.D. La. 2006)……………………………………10, 13

_Guetersloh v. State_, 930 S.W.2d 284, 287 (Tex. App. – Austin 1996, writ den. 1997, cert. den. at 522 U.S. 1110 (1998))…………………………………………………………………5, 6, 8, 10

_Guidry v. Bank of LaPlace_, 954 F.2d 278, 281 (5th Cir. 1992)…………………………………11

_Herwins v. City of Revere_, 163 F.3d 15, 18 (1st Cir. 1998)…………………………..20, 21, 22, 25

_Hudson v. Palmer_, 468 U.S. 517, 530-531 (1984)……………………………………………...18, 21

_Jabary v. City of Allen_, 2014 WL 3051315 at p. 2 (Tex. App. – Dallas 2014)…………………15

_Jabary v. City of Allen_, 547 Fed.Appx. 600, 610, 2013 WL 6153241 (5th Cir. 2013)……………………………………………………………………………2, 3, 13, 16, 29

_Liberty Mutual Insurance Company v. Brown_, 380 F.3d 793, 796-799 (5th Cir. 2004)……..15, 16

_Mathews v. Eldridge_, 424 U.S. 319, 335 (1976)…………………………………………………...19

_McClure v. Biesenbach_, 355 Fed. Appx. 800, 805 (5th Cir. 2009)……………………………16

_Meadowbriar Home for Children, Inc. v. Gunn_, 81 F.3d 521, 532-33 (5th Cir. 1996)…………..11

_Monell v. New York City Department of Social Services_, 436 U.S. 658, 694 (1978)……1, 10, 13

_North American Cold Storage Company v. City of Chicago_, 211 U.S. 306, 315 (1908)……17-19

_Odlan Holdings v. City of New Orleans_, 109 F.Supp.2d 503, 504-505 (E.D. La. 2000)………..30

_Parratt v. Taylor_, 451 U.S. 527, 539 (1981)……………………………………………..18, 19, 21

_Patel v. Midland Memorial Hospital & Medical Center_, 298 F.3d 333 (5th Cir. 2002)….20, 22, 25

_RB III, LP v. City of San Antonio_, 713 F.3d 840, 844 (5th Cir. 2013)…………………………..17

_San Remo Hotel v. City & County of San Francisco_, 545 U.S. 323, 125 S.Ct. 2491 (2005)...1, 4-10

_Webster v. City of Houston_, 735 F.2d 838, 841 (5th Cir. 1984)……………………………..11, 12

_Williamson County Regional Planning Commission v. Hamilton Bank_, 473 U.S. 172, 186 (1985)………………………………………………………………………………5, 14, 15

## CITY OF ALLEN'S MOTION FOR SUMMARY JUDGMENT

**NOW COMES** Defendant City of Allen and moves for Summary Judgment as follows:

## I. SUMMARY OF MOTION

A portion of this case had been placed on stay while Plaintiff litigated some issues in the State Court of Texas. Upon return to this U.S. District Court, Plaintiff represented to the Court on August 8, 2014 that he was seeking a lifting of the stay so that he could pursue only his takings claim and that it was only against the City. Subsequently, on October 31, 2014 Plaintiff filed a "Fourth Amended Complaint" (Doc. 167) asserting four causes of action ("Counts") against the City, as well as against Defendants McCullough and Terrell. This Motion seeks summary judgment dismissing all of the claims against the City. This Motion asserts that the State Court litigation, with results in favor of the City operates as res judicata or collateral estoppel, (or both), as to all claims which Plaintiff attempts to assert against the City herein. Even if the Court does not apply res judicata or collateral estoppel, the claims against the City fail because Plaintiff does not, and cannot establish the Monell requirements for municipal liability in a civil rights case. The law of the case bars the substantive due process claims. The four claims also fail for additional reasons.

## II. ISSUES TO BE DECIDED

Despite advising this Court on August 8, 2014 that the only viable claim against the City was the takings claim, Plaintiff's Fourth Amended Complaint (Doc. 167) – a monument to sloppy cut and paste – asserts four Counts against all of the Defendants. Against this background, the issues to be decided as to the City are:

Issue No. 1 – Whether the State Court litigation between Plaintiff and the City operate as collateral estoppel or res judicata, regardless of whether Plaintiff actually litigated some claims and regardless of an attempt to "reserve" claims for litigation in this Court? See San Remo Hotel v. City & County of San Francisco, 545 U.S. 323, 125 S.Ct. 2491 (2005).

Issue No. 2 – Whether Plaintiff's claims fail because Plaintiff has not made sufficient allegations, nor can he, to comply with the Monell requirements that an official policy or widespread practice or custom caused the Constitutional violations at issue?

Issue No. 3 – Whether Plaintiff's takings claims fail because they are not ripe?

Issue No. 4 – Under the circumstances existing at the time the Certificate of Occupancy was revoked, was there a procedural due process violation committed?

Issue No. 5 – Whether Plaintiff's two substantive due process claims fail for reasons including Plaintiff's inability to show egregious conscience shocking conduct – the necessary requirements for a substantive due process claim? See County of Sacramento v. Lewis, 523 U.S. 833 (1998).

## III.  STATEMENT OF UNDISPUTED FACTS

Defendant provides a brief statement of undisputed facts. This Statement of Undisputed Facts includes a new Number 12 and Number 15, but otherwise is essentially the same Statement as in the earlier Motion for Summary Judgment filed by McCullough and Terrell. (Doc. 135 pp. 2-4). The Court overruled Plaintiff's earlier objections to these undisputed facts. (Report, Doc. 151 p. 1). Additional factual detail and information will be set forth in the Arguments and Authorities portion of this Motion.

1.      The City of Allen Land Development Code requires a person operating a business to obtain a Certificate of Occupancy applicable to the principal use of that business. Code Section 4.20.2 (Apx. pp. 23-25). (McCullough Dec., Apx. p. 99 ¶ 6).

2.      Jabary had one Certificate of Occupancy applicable to his Hookah Lounge business. (Apx. p. 22). The Certificate of Occupancy allowed a use as "RESTAURANT (NO DRIVE-IN OR THROUGH)". (Apx. p. 22). This is the only Certificate of Occupancy that he ever obtained. (McCullough Dec., Apx. p. 99 ¶ 5).

3.      A business that operates an accessory use may do so only if the accessory use is "… customarily, incidental, appropriate, and subordinate to the principal use and located on the same lot therewith." (Land Development Code Definitions, Apx. p. 15).

4.      Jabary admits that he sold tobacco products and other merchandise, including K-2. (Second Complaint, Doc. 37 p. 6 ¶ 26) (Second Complaint, Doc. 37 p. 37 p. 9 ¶ 38 and p. 16 ¶ 78) (Fourth Complaint, Doc. 167 p. 5 ¶ 19) (Fourth Complaint, Doc. 167 pp. 7-8 ¶ 32). Jabary has admitted this in video interviews and in his Exhibit A to the December 28, 2010 Original Complaint filed pro se, Jabary admits this. (Doc. 1-1 pp. 2-3). This also was noted by the Fifth Circuit (Jabary Case, 547 Fed.Appx. at pp. 602-603). (Apx. pp. 11-13, Reports and documentation of K-2 sales by Jabary to Police Sergeant Felty) (Felty Dec., Apx. pp. 79-80 ¶ 5) (Johnson Dec., Apx. p. 84 ¶ 7) (McCullough Dec., Apx. p. 100 ¶ 12) (Citizen Email Complaint, Apx. pp. 46-48) (City Council Agenda & Minutes, Apx. pp. 49-52).

5.      As of June 9, 2010, the substance K-2 was known to be dangerous. A presentation about the dangers of K-2 was made by the Police Chief and Officer Johnson at a crowded City Council meeting (Apx. pp. 31-44) (Johnson Dec., Apx. pp. 84-85 ¶¶ 5-9) (Council Minutes, Apx. pp. 49-52). Jabary attended the meeting and spoke out. (Apx. p. 51).

6.      Defendants Terrell and McCullough attended the June 8, 2010 meeting and saw the Power Point presentation and were aware that K-2 was a dangerous substance. (Terrell Dec., Apx. p. 106 ¶¶ 7-9 and p. 94 ¶ 13) (McCullough Dec., Apx. pp. 100-101 ¶¶ 14-16).

7.      About one month after the June 8, 2010 meeting, the City of Allen adopted an ordinance banning the sale, possession or use of the primary ingredients of K-2. (Apx. pp. 56-58) (Terrell Dec., Apx. p. 107 ¶ 13). The State of Texas has now adopted a statute prohibiting the primary ingredients in K-2. (Johnson Dec., Apx. p. 85 ¶¶ 8-9). Texas Health and Safety Code Section 481.104(a)(10) – banning Salvia Divinorum. Beginning March 11, 2011 and through the present, the federal DEA has adopted regulations banning the active ingredients in K-2. 76 Fed. Reg. 11075 (March 1, 2011) (Apx. pp. 59-62); 70 Fed. Reg. 1776 (January 10, 2014) (Apx. pp. 63-67). The Fifth Circuit made note of the DEA's adoption of regulations banning K-2. (Jabary Case, 547 Fed.Appx. at p. 602.)

8.      Many, if not most, of the Hookah Lounge customers were in their teenaged years or 20s. The Hookah Lounge was located across the street from Allen High School and down the street from the Ninth Grade School. (Terrell Dec., Apx. p. 106 ¶ 9). Minors could buy K-2, but could not buy tobacco products. (Felty Dec., Apx. p. 106 ¶ 7).

9.      On May 27, 2010, Jabary's Hookah Lounge received a write-up noting many sanitation violations, and it was in a hazardous risk category. (Apx. p. 54) (McCullough Dec., Apx. p. 101 ¶ 17). On June 9, 2010, the Hookah Lounge again received a write-up noting health and sanitation violations, which included a number of the same violations previously noted on May 27, 2010 (Apx. p. 55). Again, on June 9, 2010, the risk category posed by Jabary's Hookah Lounge was "H" for hazard. (McCullough Dec., Apx. p. 101 ¶ 17).

10.      On June 9, 2010, the Hookah Lounge kitchen was dirty and unsanitary and did not meet a number of health and safety requirements. (Apx. p. 55) (McCullough Dec., Apx. p. 101 ¶ 17). The kitchen area had hookah devices in various states of assembly, apparently being cleaned. (Apx. p. 9) (Apx. p. 55) (McCullough Dec., Apx. p. 102 ¶¶ 19-20). The kitchen had a desk with a lot of junk piled on it. (Apx. p. 10) (McCullough Dec., Apx. p. 102 ¶ 20). McCullough reports that the cleanup sinks required for food preparation equipment and materials did not have functioning connected sanitizers. (McCullough Dec., Apx. p. 102 ¶ 20). All hand sinks in the Hookah Lounge were blocked and unusable. (Apx. p. 55). McCullough determined that the kitchen did not appear to be an operating condition. (Apx. pp. 103-104 ¶¶ 23-25).

11.      On June 9, 2010, Jabary did not have food on the premises that was unspoiled or was not beyond its expiration date. (McCullough Dec., Apx. pp. 101-102 ¶ 18). When McCullough asked whether Jabary could sell him food, Jabary stated that he would have go to the store to buy bread and meat to make a sandwich. However, McCullough believed that the sandwich could not be prepared in the kitchen area because of the kitchen's condition. (McCullough Dec., Apx. p. 102 ¶ 20).

12.      The May 27, 2010 inspection report notified Plaintiff that the critical items circled on the Notice of Violation were required to be corrected within the period of time stated in writing – which was within 24 hours. These critical circled items included hand sanitizer, unblocking of hand-sinks, removal of excessive equipment in the kitchen, and maintain dishes and equipment in the kitchen in a clean manner. Other circled items were noted. As shown on the June 9, 2010 report, the circled critical items had not been corrected within the 24 hours required (Apx. p. 55), and in addition, spoiled food, unlabeled food, and expired food was present. Despite all this, Mr. Jabary indicated a willingness to acquire fresh food and prepare food for Mr. McCullough even though there were no

clean, sanitary preparation or cleanup areas and there was no way for Mr. Jabary to sanitize his hands or even wash his hands to prepare and serve food. (McCullough Dec., Apx. p. 102 ¶ 20). The totality of circumstances, including these matters which had progressed to worse conditions on June 9, 2010, reasonably caused McCullough to believe there was an immediate need to shut down the business rather than risk further delay involved in giving additional notice and setting a future hearing date. (McCullough Dec., Apx. pp. 103-104 ¶ 24).

13.    On June 9, 2010, Jabary's Certificate of Occupancy was revoked effective immediately. (Apx. pp. 2-3).

14.    The City of Allen Land Development Code § 2.02 (Apx. p. 26) provided Mr. Jabary with an immediate right of appeal. If he had exercised his right of appeal within 15 days of the revocation of his Certificate of Occupancy, then in accordance with § 2.02.1.2 there would have been an immediate stay of proceedings – a stay of the revocation of his Certificate of Occupancy. He would have also been provided with a hearing. This procedure is in accordance with Texas Local Government Code § 211.010.

15.    Plaintiff squarely asserted a takings claim under the Texas and U.S. Constitutions (both private and public) in the State Court litigation and was unsuccessful because the Courts determined the claim had not ripened. (City's State Court Motion for Summary Judgment, Apx. pp. 139-203) (State Court Summary Judgment, Apx. p. 257) (Fifth Court of Appeals at Dallas ruling, Apx. pp. 412-415). Plaintiff only attempted to reserve a procedural due process claim. (Plaintiff's State Court Summary Judgment Response, Apx. p. 213 ¶ 55). All of the claims Jabary brought in the State Court arise from the same core of operative facts and transactions, and in fact his pleadings in the State Court closely match, virtually verbatim, his Federal Court Complaints. (Chart comparing pleadings, Apx. pp. 416-417).

## IV.  <u>ISSUE NO. 1 – RES JUDICATA OR COLLATERAL ESTOPPEL BAR ALL OF PLAINTIFF'S CLAIMS HEREIN</u>

This Court knows that Plaintiff litigated some of his claims against the City of Allen in State of Texas Courts. (Plaintiff's Motion, Doc. 158 pp. 1-2). The State Court issued a summary judgment in favor of the City and against Plaintiff (Apx. p. 257) and that summary judgment was affirmed by the Fifth Court of Appeals at Dallas (Apx. p. 412-415). This Court must give full faith and credit to the judgment of the State Courts of Texas. Article IV Section 1 of the United States Constitution; 28 U.S.C. § 1738; <u>San Remo Hotel v. County and City of San Francisco</u>, 545 U.S. 323, 347 (2005). When giving full faith and credit to the judgments of the State Court, the Federal Court will follow the issue preclusion rules for res judicata and collateral estoppel that would apply in the forum state (Texas). <u>San Remo</u>, 545 U.S. at 338. Furthermore, even an attempt to reserve claims for a return to

federal court can fail if Plaintiff engages in the type of litigation which Plaintiff pursued herein. San Remo at 340-341.

The Court should then turn to Texas cases addressing the res judicata and collateral estoppel impact of a final judgment. Texas follows a transactional approach to res judicata. Under this transactional approach, a claim is precluded if it arises out of the same subject matter of a previous suit and the claim either was actually litigated, or through the exercise of diligence, could have been litigated in the prior suit. If so, then the claim is barred. Barr v. Resolution Trust Corporation, 837 S.W.2d 627, 631 (Tex. 1992); Guetersloh v. State, 930 S.W.2d 284, 287 (Tex. App. – Austin 1996) (writ den. 1997, cert. den. at 522 U.S. 1110 (1998)). In the present case, there is absolutely no doubt that the State Court litigation arises out of the same subject matter as the present litigation. Plaintiff's Original Petition in the 219th District Court is included herein (Apx. pp. 110-121) and his Amended Petition is also included (Apx. p. 126-138). In order to save the Court time, Defendant has prepared a detailed chart comparing Plaintiff's Second Amended Complaint herein (Doc. 37), his sloppy Fourth Amended Complaint herein (Doc. 167)), and the chart compares Plaintiff's allegations in his federal Complaints to the allegations and claims in his State Court pleadings (Chart, Apx. pp. 416-417). It is absolutely clear that Plaintiff's claims in both pieces of litigation are exactly the same transactions. The Court should recognize that the Guetersloh case involved a plaintiff asserting that he had suffered a taking, and that plaintiff was required to exhaust his state remedies in order to ripen his federal claim in accordance with Williamson County, 473 U.S. at 172. The Guetersloh Court recognized that the plaintiff was involuntarily in state court because of the exhaustion requirement, but the Guetersloh Court went on to hold that the plaintiff's federal takings claim was not reserved. Therefore, even though the plaintiff could have simultaneously litigated his state and federal takings claims in State Court, and even though the plaintiff only litigated his state law takings claims in the Texas Court, and even though he was involuntarily in State Court, res judicata barred his federal takings claim because he had not properly reserved that claim. Guetersloh, 930 S.W.2d at 289-290.

Here, all of Plaintiff's federal claims against the City are barred pursuant to Texas' rules regarding res judicata or collateral estoppel, and pursuant to the Supreme Court's <u>San Remo</u> case. *First*, pursuant to <u>Guetersloh</u>, Plaintiff's takings claim is squarely barred because Plaintiff clearly litigated his state and federal takings claims simultaneously in the State Court proceeding. In his State Court Original Petition, as well as in his State Court Amended Petition, Jabary squarely asserted, using virtually identical wording to his federal Complaints, a private taking and a public taking claim. (Original Petition, Apx. pp. 118-120 ¶¶ 45-66) (Amended Petition, Apx. pp. 134-136 ¶¶ 45-66). Jabary made absolutely no statement to the State Courts that he was reserving his takings claims for return to federal court. In fact, Jabary squarely alleged in both his Original and Amended Petitions that his claims were based on the Fifth Amendment to the U.S. Constitution made applicable to the States by the Fourteenth Amendment. (Original Complaint, Apx. p. 119 ¶ 59) (Amended Complaint, Apx. p. 135 ¶ 59). Under <u>Guetersloh</u>, because there was not even an attempt to reserve these claims in the State proceedings, and because Plaintiff simultaneously litigated his state law and federal law takings claims, especially because he chose not to notify the State Courts that he was reserving those takings claims for return to the Federal Court, <u>Guetersloh</u> clearly recognizes that Jabary's federal takings claims are barred. <u>Guetersloh</u>, 930 S.W.2d at 290. This Court should also recognize that the holding of the U.S. Supreme Court's <u>San Remo</u> decision would also bar Plaintiff's federal takings claims because Jabary already litigated the claims.

The Supreme Court recognized a narrow circumstance in which it may allow a litigant to insulate from preclusive effect one federal issue, which was not litigated in state proceedings, for a return to federal court. In that case, the plaintiff sought to reserve a facial Constitutional challenge to a hotel conversion ordinance. <u>San Remo</u>, 545 U.S. at 340-341. The Supreme Court pointed out that the California Courts have made statements recognizing the <u>San Remo</u> plaintiff's attempt to reserve federal causes of action. <u>San Remo</u>, 545 U.S. at 332-333. Despite this attempt to reserve the claim, the U.S. Supreme Court squarely held that if a party litigates a claim, then that claim cannot be reserved

for return to federal court. <u>San Remo</u>, 545 U.S. at 338. In fact, the Supreme Court clearly stated that a party may not negate the preclusive effect of the State Court judgment even when a litigant expects that his reservation of claims would negate the preclusive effect of the State Court judgment. <u>San Remo</u> at 338.

Here, Jabary squarely litigated his takings claim, the State Court has determined that his takings claims were not ripe, and the State Court dismissed his claims. Jabary cannot return to this Court, proclaim that he reserved that claim for another bite at the apple, and then re-litigate a claim that already been litigated and decided against him. Doing so violates the res judicata or collateral estoppel effect recognized by Texas and recognized by the Supreme Court of the United States.

The remainder of Plaintiff's claims against the City - Count II, Procedural Due Process, and so-called Count IV and Count V, Substantiative [*sic*] Due Process and Chilling Effect Substantiative [*sic*] Due Process fail for the same reasons. As a starting point, even assuming that Plaintiff arguably could have reserved any of these claims, he made absolutely no effort to notify the State Courts that he was reserving his substantive due process claims for return to federal court. As noted above, he made some effort to notify the State Courts that he may be reserving his procedural due process claim for return to federal court. However, as the Court can see, with the guidance of the chart included in the Appendix (Apx. pp. 416-417), all of the three remaining Counts squarely arise out of the same facts and circumstances and transactions which Plaintiff has used as a basis for his takings claim. By elaborately asserting these facts and circumstances – utterly irrelevant to his takings claim – Plaintiff has done essentially the same thing that the plaintiff did in the <u>San Remo</u> case. In the <u>San Remo</u> case, the plaintiff presented broader claims than their takings claim. <u>San Remo</u> at 341. By doing so, Plaintiff Jabary is barred by issue preclusion (collateral estoppel) or claim preclusion (res judicata) from pursuing those claims in this Court – regardless of whether or not he attempted to reserve those claims. <u>San Remo</u> at 347.

Assuming in advance that Plaintiff may try to argue that his trip to State Court was

involuntary, thus arguably allowing him to evade the preclusive effect of the State Court judgments on his three remaining claims, that argument fails. *First*, the Supreme Court's <u>San Remo</u> case squarely recognized that even when a plaintiff's resort to state court is involuntary, and even if the federal interest in denying finality of the State Court judgment is a robust interest, Plaintiff cannot escape the finality and preclusive effect of the State Court judgment unless Congress has "clearly manifest" its intent to depart from the full faith and credit effect of 28 U.S.C. § 1738. <u>San Remo</u> at 344-345. The Supreme Court had no difficulty finding that Congress had no intent to depart from the full faith and credit of the final State Court judgment in the <u>San Remo</u> case – involving claims and procedures which cannot be distinguished from Mr. Jabary's claims herein. *Second*, even under the <u>Guetersloh</u> case, Mr. Jabary could not reserve his claims of Procedural Due Process and Substantive Due Process for return to federal court. The only arguably involuntary aspect of the State Court litigation was the takings issue – which required exhaustion of state remedies. However, Texas would only recognize a litigant as being involuntarily in State Court under two limited circumstances that simply do not apply herein. *First*, the litigant must be a defendant in a non-removable State Court action, and the defendant wishes to pursue a federal counterclaim. The *second* limited exception would be if federal law imposed an exhaustion requirement upon a litigant as a precondition of bringing a federal claim in federal court. Under that circumstance, that arguably could have existed herein (for the takings claim only), the plaintiff is required to notify the State Court that he wishes to reserve his federal claim, and the plaintiff certainly must avoid litigating the federal claim. See <u>Guetersloh</u>, 930 S.W.2d at 289-290; <u>San Remo</u> at 341.

However, Jabary litigated his taking claim and as excuses for avoiding the ripeness requirement for a takings claim, he asserted much the same allegations that support his other three claims. For example, Plaintiff's State Court Summary Judgment Response clutters the State Court proceedings with many of the same allegations that he has made in his federal Complaint, and Plaintiff made such allegations in the State Court in an unsuccessful attempt to evade the settled

requirement that Plaintiff must exhaust available administrative remedies under state law before his takings claim can ripen. (See Response, Apx. pp. 212-219 ¶¶ 50-95.) Once again, in Jabary's State Court Appellant's Brief, he made many of the same unsuccessful arguments and excuses trying to avoid the consequences of his failure to exhaust administrative remedies. (Appellant's Brief, Apx. pp. 258-303.) For example, Jabary's Issue for Review asserted that because Jabary was not provided with post-deprivation due process, he should be excused from being required to utilize and exhaust state remedies. (Appellant's Brief, Apx. p. 267 Issue 2; see body of Brief, Apx. pp. 279-287.) Jabary also argued that his potential administrative appeal was futile based on much the same allegations that he used to assert that he was treated unfairly in violation of procedural and substantive rights. (Apx. pp. 296-298). Jabary re-urged many of these assertions in his Appellant's Reply Brief. (Apx. pp. 368-411). He again asserted that because of the unfairness of the Defendants and based on various other theories similar to the theories he asserts herein as a basis for his procedural due process violations and his substantive due process violations, he should be excused from exhausting his available administrative appeal. (Appellant's Reply Brief, Apx. pp. 375-392). Jabary even acknowledged in his Reply Brief that he was asserting that the lack of procedural due process which he claimed took place created some sort of imaginary exception to application of the exhaustion doctrine. (Appellant's Reply Brief, Apx. pp. 393-395). And finally, Jabary once again asserts that because he would not have been treated fairly due to the conspiratorial actions of the various individuals who were or are Defendants in the present federal court proceeding, it would have been futile for him to initiate and exhaust his administrative appeal. These are the same arguments he uses as a basis for his substantive due process claim. (Appellant's Reply Brief, Apx. pp. 395-401). This is quite similar to the actions of the plaintiff in San Remo, and in San Remo, such actions barred the plaintiff from "reserving" such federal claims for future litigation in federal court. San Remo at 341.

As to the procedural due process claim, and the substantive due process claims, there was no exhaustion requirement and therefore Jabary certainly was not an involuntary litigant in the Texas

courts. By failing to fully litigate those claims, which he certainly could have and should have done, the claims are barred by the Texas application of res judicata and collateral estoppel. Guetersloh, 930 S.W.2d at 290. This Federal Court must give full faith and credit to the Texas judgment which operates to bar all of Plaintiff's federal claims against the City. San Remo at 347-348. For these reasons, Plaintiff's claims against the City fail in their entirety and must be dismissed.

## V.   ISSUE NO. 2 – CLAIMS AGAINST THE CITY FAIL BECAUSE PLAINTIFF DOES NOT MEET MONELL REQUIREMENTS

### A.   Description of Claims

All of Plaintiff's claims against the City are civil rights claims which he attempts to bring pursuant to 42 U.S.C. §§ 1983 and 1985.[1] (Complaint, Doc. 167 pp. 1-2 ¶ 5). Plaintiff's claims against the City fail and may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because Plaintiff has utterly failed to plead anything other than conclusions regarding essential requirements of a civil rights claim against the City. The Court must note that this is Plaintiff's Fourth Amended Complaint, which is actually his fifth attempt to plead a case against the City, and Plaintiff has filed this Complaint almost four years after starting this lawsuit on December 28, 2010. It is certainly appropriate at this late date to hold Plaintiff to meeting the bare pleading requirements for a claim against the City under Monell v. New York City Department of Social Services, 436 U.S. 658, 694 (1978), and do so in accordance with the requirements of Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### B.   Plaintiff Does Not Meet Requirements for a Civil Rights Claim Against the City

#### 1.   Basic Facts Plaintiff Must Plead Against City

It is well settled that the Defendant City cannot be held liable for civil rights violations under a theory of Respondeat Superior. Monell, 436 U.S. at 694. The Defendant City cannot be sued and subjected to damages unless its official policy or custom caused the Plaintiff to be deprived of a

---

[1] Plaintiff had formerly asserted an equal protection claim in the Second Amended Complaint. That claim was dismissed. Plaintiff has abandoned that claim in his Fourth Amended Complaint. This may explain his oddly numbered "Counts" which begin I and II and finish with IV and V. At any rate, § 1985 has no bearing on the present case, but would have been a statutory vehicle for pursuing the equal protection claim which has been abandoned. However, even a claim pursuant to 42 U.S.C. § 1985 is subject to the Monell requirements. Green v. Tilley, 2006 WL 220847 p. 3 (W.D. La. 2006); Dimagio v. O'Brien, 497 F.Supp. 870, 876 (E.D. Pa. 1980).

Case 4:10-cv-00711-ALM   Document 170   Filed 11/14/14   Page 15 of 34 PageID #:  2838

federally protected right. <u>Board of County Commissioners v. Brown</u>, 520 U.S. 397, 403 (1997). Therefore, in order to support a claim based on the existence of a custom or policy, Plaintiff must plead facts to show that (1) a policy or custom existed; (2) governmental policy makers actually or constructively knew of its existence; (3) a Constitutional violation occurred; and (4) the custom or policy served as the moving force behind the violation. <u>Meadowbriar Home for Children, Inc. v. Gunn</u>, 81 F.3d 521, 532-33 (5th Cir. 1996). Plaintiff's description of the policy or custom and its relationship to the underlying Constitutional violation cannot be conclusory; it must contain specific facts. <u>Spiller v. City of Texas City</u>, 130 F.3d 162, 167 (5th Cir. 1997).  Plaintiff must establish that his claims are based on Defendant's official policy, not the policy of an individual official. <u>Bennet v. City of Slidell</u>, 728 F.2d 762, 769 (5th Cir. 1984).

## 2. <u>Plaintiff Does Not Identify A Policymaker</u>

A plaintiff may not simply assert conclusory allegations about a policymaker, and then contend that such allegations are sufficient to withstand a Rule 12(b)(6) Motion to Dismiss. Here, Plaintiff does not even attempt to identify a policymaker. To avoid dismissal, the Plaintiff must plead specific facts rather than conclusory allegations. Conclusory allegations simply are insufficient to withstand a Motion to Dismiss.  <u>Guidry v. Bank of LaPlace</u>, 954 F.2d 278, 281 (5th Cir. 1992); <u>Chiras v. Miller</u>, 432 F.3d 606, 611 (5th Cir. 2005). In this case, Plaintiff simply makes nothing but conclusory allegations without even describing a factual basis supporting any assertion that he has identified a policymaker or that a policymaker was actually or constructively aware of any relevant policy, custom or practice.

A policymaker is one who takes the place of the governing body in a designated area of City administration. <u>Webster v. City of Houston</u>, 735 F.2d 838, 841 (5th Cir. 1984). The policymaker must have non-delegable final decision-making authority. <u>Bennet v. City of Slidell,</u> 728 F.2d 762, 769 (5th Cir. 1984).

Plaintiff's broad conclusory recitations are not sufficient to establish the existence of a

___
**CITY OF ALLEN'S MOTION FOR SUMMARY JUDGMENT – Page 11**

municipal policymaker. These allegations are even more vague than allegations the Supreme Court found inadequate. Iqbal, 556 U.S. at 680-681. For this reason, all of the claims against the City fail.

### 3. Plaintiff Does Not Identify a Policy

Plaintiff has not pointed to any specific facts to show that any City policy or custom whatsoever was involved in or caused a violation of civil rights. Other than conclusions, Plaintiff does not provide specific nonconclusory facts to show a widespread custom that was involved or caused a violation of civil rights. Plaintiff has not (and cannot) point to any specific existing policies or customs that caused a violation of a Constitutional right. While a policy statement formally adopted by an official policymaker might suffice, Plaintiff does not, and cannot point to any such formal policy. In fact, the City Secretary states there are no such policies. (George Dec., Apx. p. 82 ¶ 5).

Plaintiff also utterly fails to describe or even factually claim that there was a persistent widespread practice by City officials or employees that was so common and well settled as to constitute a custom representing municipal policy. Webster, 735 F.2d at 841. The only situation Plaintiff identifies is his own situation. That is not enough to show a policy or custom. Furthermore, Mayor Terrell and City Secretary George attend the City Council meetings. Ms. George is the record keeper for records of the City Council. (George Dec., Apx. p. 82 ¶¶ 3 & 4). The City has adopted elaborate procedures allowing members of the public to address the City Council about any matter, and members of the public certainly could bring forward any complaint or grievances, or reports of matters including allegations that there is an unconstitutional widespread practice. (See Rules of Order and Procedures, Apx. pp. 88-90) (Terrell Dec., Apx. pp. 107-108 ¶¶ 14-18). Both the Mayor and City Secretary directly state that they are not aware of, and no one has brought to their attention, any claim like Mr. Jabary's involving allegations of violations of Constitutional rights in a manner similar to that claimed by Mr. Jabary. (George Dec., Apx. p. 82 ¶ 5) (Terrell Dec., Apx. pp. 107-108 ¶¶ 15-18). In short, there certainly is a not a policy or widespread practice or custom causing the alleged Constitutional violations Mr. Jabary complains about herein. The Complaint fails under Iqbal and

Monell.

### C.  **Plaintiff Does Not Show a Civil Rights Violation Committed by Anyone**

Plaintiff's Fourth Amended Complaint wherein he attempts to raise substantive due process claims is simply a rehash of his earlier unsuccessful live pleading – the Second Amended Complaint (Doc. 37). Again, Defendant directs the Court to the Comparison Chart that compares the Fourth Amended Complaint and the Second Amended Complaint (Apx. pp. 416-417). This Court has already ruled that Jabary's allegations failed to state an equal protection claim against anyone, that claim was dismissed (Report, Doc. 78 p. 13), and the dismissal (Doc. 100 & Doc. 119) was upheld by the Fifth Circuit. Jabary Case, 547 Fed. Appx. at 605. In fact, the Fourth Amended Complaint with his awkward cut and paste numbering abandons the stand-alone equal protection claim that had been previously asserted, but then tries to resurrect that claim by somehow mixing it in with his substantive due process claims. Nonetheless, the claim fails.

Furthermore, the Court considered and dismissed the substantive due process claims brought against all of the individuals based on the Court's determination that Jabary failed to state a claim in his Second Amended Complaint (Doc. 78 p. 14). That Recommendation was adopted by the District Judge (Doc. 100), a final judgment dismissing the substantive due process claims against the individuals with prejudice was issued (Doc. 119). That dismissal was upheld by the Fifth Circuit. (Jabary Case, 547 Fed. Appx. at 610.) It is therefore the settled law of the case that Plaintiff has failed to state a claim that any of the actors he identified committed any substantive due process violations. Barrow v. Greenville I.S.D., 2007 WL 3085028 at p. 9 (5th Cir. 2007); Free v. Abbott Labs, Inc., 164 F.3d 270, 272 (5th Cir. 1999).  Because there is no showing of a substantive due process violation by anybody, the claim fails as to the City and should be dismissed for that reason. Elsewhere in this Brief, as well as in the previously submitted Motion for Summary Judgment by McCullough and Terrell (Doc. 135), along with the concurrently submitted Second Motion for Summary Judgment by those individuals, there is a showing that the procedural due process claim fails. And finally, the

takings claim has not and cannot ripen, and therefore it fails. For all these reasons, Plaintiff cannot show any of the required elements of a civil rights claim against the City and all of his claims must be dismissed.

## VI.  ISSUE NO. 3 – FAILURE OF THE TAKINGS CLAIM
### A.  Description of Claim

The Fourth Amended Complaint asserts a takings claim based on Plaintiff's theory that revoking his Certificate of Occupancy deprived him of a protected property interest (Complaint, Doc. 167 pp. 12-13 ¶¶ 50-58). While Plaintiff continues to conclusorily assert that the property – the Certificate of Occupancy – was transferred to a private party without compensation and that this purportedly amounts to a private taking, that aspect of the claim fails on its face because of its conclusory nature and its utter failure to describe any factual basis for the claim. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, Plaintiff does not describe how his Certificate of Occupancy could be transferred, or how it was transferred. For these reasons, the private takings claim fails. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### B.  The Takings Claim is Not Ripe

It is well settled that in order for a takings claim to ripen, the claimant must have exhausted available adequate state procedures for obtaining relief. Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 186 (1985). In fact, the claims against the City were placed on a stay so that Plaintiff could pursue his State Court remedies and any litigation he chose to pursue in the Texas courts. Jabary certainly did not timely take advantage of the City's appeal remedies as provided in City Ordinance (Apx. p. 26). These remedies are also available pursuant to Texas Local Government Code §§ 211.008 – 211.010. He simply did not ever use such remedies. (McCullough Dec., Apx. p. 104 ¶ 26).

In a carefully reasoned opinion issued by this Honorable Magistrate Judge, at a time when he was sitting as a Dallas Court of Appeals Judge, the Court recognized that if there are available

---

administrative appeal remedies that the aggrieved party could have used to challenge a takings claim, then the takings claim does not ripen unless the administrative remedies were utilized. <u>City of Dallas v. Chicory Court Simpson Stewart</u>, 271 S.W.3d 412, 421-423 (Tex. App. – Dallas 2008, rev. den. 2009). In the <u>Chicory Court</u> case, this Court's learned Magistrate Judge recognized that in order for a federal takings claim to ripen, the claimant must have used available and adequate state procedures for obtaining relief. <u>Chicory Court</u> at p. 423, citing <u>Williamson County</u>, 473 U.S. at 186; <u>Liberty Mutual Insurance Company v. Brown</u>, 380 F.3d 793, 796-799 (5th Cir. 2004).

It remains undisputed that Mr. Jabary utterly failed to use the available remedies to challenge the revocation of his Certificate of Occupancy. (McCullough Dec., Apx. p. 104 ¶ 26) Allen Land Development Code Section 2.02 established a right of appeal that must have been exercised within 15 days after the revocation of the Certificate of Occupancy on June 9, 2010. (Apx. p. 26). The City has litigated that issue with Mr. Jabary in the 219th District Court of Texas. (See City's State Court Motion for Summary Judgment, Apx. pp. 139-203.) The 219th District Court granted summary judgment dismissing the takings claim (both public and private) with prejudice. (Apx. p. 257). The Fifth Court of Appeals of Texas at Dallas agreed that the case should be dismissed because Mr. Jabary had not ripened his takings claim by appealing pursuant to the City ordinance or pursuant to Texas Local Government Code § 211.008 – 211.010. (<u>Jabary v. City of Allen</u>, 2014 WL 3051315 at p. 2 (Tex. App. – Dallas 2014). The State Court determined correctly that Mr. Jabary had failed to utilize available state procedures. As recognized in the <u>Chicory Court</u> case, and in Mr. Jabary's Court of Appeals case, the Texas procedures for recovery in the face of an inverse condemnation takings claim like the present are adequate. <u>Jabary v. City of Allen</u>, 2014 WL 3051315 at pp. 3-4 (Tex. App. – Dallas 2014). Therefore, just like the result in <u>Chicory Court,</u> the Plaintiff could never properly present its state law claim due to its failure to use the adequate available remedies, and therefore the federal takings claim cannot ripen because the state claim never ripened. That is exactly the situation before this Court – Jabary's failure to use the adequate state procedures and remedies (see Report,

Doc. 151 p. 18) prevents his takings claim from ever ripening. Because the claim has never ripened, and at this late date can never ripen, and because Jabary has had full opportunity to litigate his takings claim, and litigate his inadequate excuses for not ripening the claim, the Court should put an end to that claim and dismiss it with prejudice. <u>Liberty Mutual</u>, 390 F.3d at 796-799.

## VII.   <u>ISSUE NO. 4 - THERE WAS NO VIOLATION OF PROCEDURAL DUE PROCESS</u>
### A.   <u>Overview of Procedural Due Process Claim</u>

Jabary claims that when his Certificate of Occupancy was revoked, he did not receive due process of law. (Doc. 167 pp. 13-15 ¶¶ 59-67). (<u>Jabary</u> Case at p. 611.) Before delving into whether or not a procedural due process violation occurred, the Court must recognize that the City is only liable for such a violation if its policy or widespread practice or custom caused a procedural due process violation. Plaintiff's judicial admission in his Complaint that:

> "…<u>The City of Allen had an adequate procedure</u> to follow prior to the revocation of Jabary's Certificate of Occupancy…"

(Complaint, Doc. 167 p. 9 ¶ 39). Plaintiff then goes on to conclusorily assert that despite the adequate procedures, Terrell ignored these procedures. Of course, Terrell establishes that he had no involvement in the revocation of the Certificate of Occupancy. (Terrell Dec., Apx. p. 107 ¶¶ 11 & 12). This Court already recognized that there is simply no evidence of Terrell's involvement. (Report, Doc. 151 p. 14).

In a case with some factual parallels, City of San Antonio officials revoked a concert permit and shut down a large, outdoor concert festival after they determined that the noise resulting from the concert was unreasonable. The revocation took place without prior notice or hearing. <u>McClure v. Biesenbach</u>, 355 Fed. Appx. 800, 805 (5th Cir. 2009). However, the Court recognized that the City of San Antonio did have in place an adequate procedure, which the Code Officer could have chosen to use, providing for notice and a hearing prior to revoking the permit. <u>McClure</u>, 355 Fed. Appx. at 805. Thus, the one time occurrence of Code Enforcement Officers revoking a permit did not amount to an

unconstitutional policy.

Here, the City of Allen did have an available procedure that could have provided for notice and a hearing prior to shutting down the so-called restaurant (Apx. pp. 91-97). Mr. McCullough was aware that such a procedure existed. (McCullough Dec., Apx. pp. 103-104 ¶ 24). However, in Mr. McCullough's 25 years of code enforcement experience he had never encountered a situation so challenging and unusual as the situation involving Mr. Jabary, and Mr. McCullough thought that the circumstances were such that it was reasonable to immediately shut down Jabary's business because of the immediate risk to public health and safety. (McCullough Dec., Apx. pp. 103-104 ¶¶ 24-27). As set forth in the following discussion, McCullough's determination of an immediate risk to public health and safety was reasonable and therefore taking action for an immediate shut down, in the context of an immediately available appeal, fully comports with due process requirements.

## B.  Availability of Hearing After the Fact Can Be Adequate

The Fifth Circuit recently recognized the well-settled rule that even though the Fourteenth Amendment's due process laws generally require that the State provide an opportunity to be heard before it takes property, pre-deprivation notice is not always required. RB III, LP v. City of San Antonio, 713 F.3d 840, 844 (5th Cir. 2013). It has long been recognized that when the government acts expeditiously in the face of a potential public health or safety hazard, taking action without prior notice and a hearing, due process is not violated. As long ago as 1908, the Supreme Court addressed a case in which the City of Chicago, Illinois seized and destroyed food that was unfit for human consumption that was being stored in a cold storage facility. North American Cold Storage Company v. City of Chicago, 211 U.S. 306, 315 (1908). In North American Cold Storage, the Supreme Court recognized the right and duty of government actors to protect and guard the lives and health of their inhabitants, and therefore an ordinance providing for seizure and destruction of spoiled food without notice and a hearing in advance was not unconstitutional. The Supreme Court stated that if such a determination that food was spoiled was improper, the party challenging the determination had a right

for a hearing after destruction of the food, and this was sufficient to meet the requirements of due process of law under the Fourteenth Amendment. North American Cold Storage, 211 U.S. at 316.

As mentioned, this Court's Magistrate's Report previously expressed concern that because some of the same or similar circumstances had existed prior to June 9, 2010. The Court thought it may be a jury issue as to whether McCullough acted arbitrarily or abused his discretion when he concluded an emergency existed on June 9, 2010. It is very important to note that the earlier conditions, albeit similar, did not include a presence of spoiled food (May 27, 2010 Inspection Report, Apx. p. 54), and did not include Jabary expressly offering to obtain unspoiled food and then prepare it and serve it from his unsanitary kitchen that lacked sanitary food preparation and cleanup areas, and that continued to lack hand sanitizer and continued to lack functional hand-washing facilities. These additional factors present on June 9, 2010 support McCullough's concern that an immediate hazard to public health and safety existed. (June 9, 2010 Report, Apx. p. 55; McCullough Dec., Apx. pp. 103-104 ¶ 24). At any rate, on the day the Certificate was revoked, spoiled food existed and the offer to prepare fresh food was of concern because of the inability to prepare fresh food in sanitary facilities that could be served by people with clean or sanitized hands.

More recently, the U.S. Supreme Court addressed procedural due process claims in a case involving an inmate's assertion that he had been deprived of property without advance notice and a hearing. Hudson v. Palmer, 468 U.S. 517, 530-531 (1984). The Supreme Court stated that:

> "Either the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's actions at some time after the initial taking… satisfies the requirements of procedural due process."

Hudson, 468 U.S. at 531-532, citing Parratt v. Taylor, 451 U.S. 527, 539 (1981). Thus, merely because notice and an opportunity to be heard was not provided in advance does not automatically create a violation of the Constitution. The Fifth Circuit states:

> "Procedural due process is a flexible concept whose contours are shaped by the nature of the individual's and the State's interests in a particular deprivation. Ordinarily,

government may effect a deprivation only after it has accorded due process, but the necessary amount and kind of pre-deprivation process depends upon an analysis of three factors:  first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved in the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Caine v. Hardy, 943 F.2d 1406, 1411-1412 (5ᵗʰ Cir. 1991), citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  The Court went on to state that due process does not require even an informal hearing in advance of a deprivation if the deprivation of a recognized interest is undertaken to protect the public safety. Caine, 943 F.3d at 1412. The Fifth Circuit reviewed the long history of cases in which the Supreme Court consistently held that the necessity of quick action by the State in matters of public health or safety justifies a summary deprivation followed by an adequate post-deprivation remedy. Caine at p. 1412, citing North American Cold Storage and other Supreme Court cases, including Parratt v. Taylor.

It is beyond dispute that Jabary had a right to challenge the revocation of his Certificate of Occupancy, that the procedure for challenging the revocation was swift, and would be conducted by the City's Board of Adjustment. (Apx. p. 26). If Jabary had appealed the revocation of his Certificate of Occupancy within 15 days of the revocation, his appeal would have operated to immediately stay the revocation, unless an appropriate official would have taken action to challenge the stay of proceedings. This City procedure is set forth in City of Allen Code Section 2.02 (Apx. p. 26) that is adopted pursuant to and consistent with the Texas Local Government Code, Section 211.010. (See Ordinance's cross reference to Local Government Code § 211.008 et seq. at Apx. p. 26). Jabary makes no claim anywhere in this lawsuit that he did not have a right to take the appeal. Jabary makes no challenge that the procedure afforded him, if he had taken an appeal, would have been inadequate. It is important to note that this Court has already determined that the post-deprivation procedures available to Mr. Jabary were certainly adequate. (Report, Doc. 151 p. 18).

### C.  <u>Public Health Or Safety Is An Exigency Allowing Hearing After the Fact</u>

Diligent review of caselaw has not resulted in locating a case with exact factual parallels to the present situation. However, courts have regularly upheld public officials' actions affecting or taking property when the public official reasonably believed a public safety or health issue was involved.

The Fifth Circuit stated there was no procedural due process violation when a public hospital immediately suspended a doctor's clinical privileges, but also provided a right to a hearing after this. <u>Patel v. Midland Memorial Hospital and Medical Center</u>, 298 F.3d 333 (5th Cir. 2002). In that case, a hospital committee reasonably determined that Dr. Patel's performance showed a high concentration of severe complications in his cases and that a number of his patients had died as a result of his use of interventional procedures. The committee suspended Dr. Patel's privileges immediately. Dr. Patel was afforded a prompt post-suspension hearing resulting in unanimous recommendation that his privileges be reinstated. <u>Patel</u>, 298 F.3d at 340-341.

When looking at the immediate suspension and the fact that a prompt follow-up hearing was available to Dr. Patel, the Court recognized:

> "In some cases, 'where a state must act quickly, or where it would be impractical to provide pre-deprivation process,' post-deprivation process is enough to satisfy the requirements of due process."

<u>Patel</u>, 298 F.3d at 339, citing <u>Gilbert v. Homar</u>, 520 U.S. 924, 930 (1997). In Dr. Patel's case, the Court noted that Dr. Patel's evidence demonstrated that he was not actually a danger at the time of his suspension. However, the Court also stated:

> "The key question is not whether Dr. Patel was actually a danger, but whether the [public hospital] had reasonable grounds for suspending him as a danger. <u>Gilbert</u>, 520 U.S. at 933."

<u>Patel</u>, 298 F.3d at 341. (See also Report, Doc. 151 pp. 17-18.)

Another case involving concerns, perhaps incorrect, about public health and safety is: <u>Herwins v. City of Revere</u>, 163 F.3d 15, 18 (1st Cir. 1998). Mr. Herwins, the owner of an apartment building, sued the City and its inspector because the inspector determined there were a number of violations of

health and safety standards, and the inspector ordered that the apartment building must be immediately shut down and vacated. The stated reasons for shutting down the apartment building and ordering it to be vacated included a lack of heat. There was a dispute as to whether the heat had been turned off for any substantial length of time. Herwins, 163 F.3d at 16-17. At any rate, Mr. Herwins did not use an available immediate right to a hearing, and he also allowed his business – the apartment building – to remain closed for at least seven months before he had it independently inspected. The independent inspection concluded that many of the alleged violations that were used as a basis for shutting down the building did not exist and even taken together, the violations did not endanger any of the tenants. Herwins, 163 F.3d at 17. Herwins therefore sued alleging that he had been subjected to an illegal shutdown, and that his procedural due process rights had been violated. Even though the City determined that some of its inspector's actions were incorrect, and even though a jury later determined that the inspector's substantive decision was wrong regarding the grounds for the emergency shutdown, there was no procedural due process violation because there were adequate post-deprivation remedies available – which Herwins did not use.

The First Circuit stated that even if the City inspector was mistaken about the basis for shutting down the apartment building, as long as an adequate means of redress was available, there was no procedural due process violation regardless of whether the actions were negligent, or whether the official acted deliberately. Herwins, 163 F.3d at 19, citing the U.S. Supreme Court decisions in Parratt, 451 U.S. at 543-544 and Hudson, 468 U.S. at 536-537. The adequate remedy that Mr. Herwins chose not to use involved appealing the shut-down order to the City Board of Health, and from there if he was dissatisfied, he could have appealed to court. 163 F.3d at 19. The same remedies were available to Mr. Jabary in the present case – he simply chose not to use them. (Apx. p. 26) (McCullough Dec., Apx. p. 104 ¶ 26). Tex. Local Gov't Code § 211.010. This Court's Magistrate has found the available remedies to be adequate. (Report, Doc. 151 p. 18).

Another similar ruling is: Elsmere Park Club v. Town of Elsmere, 542 F.3d 412, 417-418 (3rd

Cir. 2008). The plaintiff was the owner of an apartment complex involving 39 buildings and 156 apartments. Elsmere Park Club, 542 F.3d at 414-415. A series of inspections led to the shutdown of every building in the complex except the management office. The buildings were ordered shut down, without a hearing or advance notice, based on the City inspector's determination that mold could be found in the basement of the buildings and could migrate to the occupied units. At no time did the Town actually examine any of the occupied apartments, and there was no showing of what category of mold was actually present in the basement. Elsmere Park Club, 542 F.3d at 415. The Court agreed that it was well-settled that summary administrative action may be justified in emergency situations without a requirement for an advance notification and hearing. The Court considered how it should assess whether or not an emergency existed. The Court stated that appropriate deference should be shown to a decision of a public official that an emergency existed justifying immediate action. The Third Circuit adopted the deferential review standard laid out by the Second Circuit. Under that standard, the Court stated:

> "Where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist… the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion."

542 F.3d at 418, citing Catanzaro v. Weiden, 188 F.3d 56, 62-63 (2nd Cir. 1999). The same deferential standard was used in the Herwins case, 163 F.3d at 19. The Court should then look to the competent evidence known to McCullough at the time he decided it was necessary to revoke the Certificate of Occupancy.

## D.  Competent Evidence Supporting Immediate Revocation

The proper inquiry at this stage of the case is not whether there were substantive grounds ultimately justifying the decision to revoke the Certificate of Occupancy, but instead whether the revocation without advance notice and a hearing violated Mr. Jabary's procedural due process. Patel, 298 F.3d at 341. McCullough's Declaration provides the various reasons he thought there were code

violations sufficient to support a revocation of Jabary's Certificate of Occupancy. (See McCullough Dec., Apx. pp. 98-104 ¶¶ 3-27.) Basically, Mr. Jabary's Hookah Lounge appeared to be a business having a principal use that was not a restaurant, and therefore McCullough could have chosen to revoke the Certificate of Occupancy in accordance with Allen Land Development Code Section 2.06 (Apx. p. 53) or in accordance with Land Development Code Section 1.08(9) (Apx. p. 14). McCullough explains in detail his reasons for concluding that the business that was being operated was not a restaurant business. The principal use of the business means the most important or more consequential use, the uses of primary importance. Against this plain English meaning of the words principal use, a reasonable interpretation of principal use for a business operating under a Certificate of Occupancy for a restaurant will be that at least 51% of the operations must meet the definition of a restaurant. (McCullough Dec., Apx. p. 99 ¶ 7). This Hookah Lounge was just that – some sort of smoking establishment that either exclusively or almost exclusively sold smoking products, smoking accessories, and smoking materials, including K-2. (McCullough Dec., Apx. p. 100 ¶ 12). In short, the business was not a restaurant and McCullough reasonably believed he could revoke the Certificate of Occupancy.

### 1.  Health & Safety Problems With Food & Kitchen

In evaluating whether or not advance notice and a hearing was required, the record shows there were sufficient factors present to support a determination of a risk to public health and safety, using the appropriate standard of review. Key portions of Mr. McCullough's sworn Declaration are hereby summarized:

1.  Even though Jabary's business was authorized to operate only as a restaurant, by April or May of 2010, it was being operated as Jabary Hookah Lounge – primarily some sort of a retail store or smoking establishment, and it was not really operating as a restaurant. Mr. Jabary was, at that time, selling a product known as K-2 and he was selling smoking products, smoking accessories, smoking materials, incense, and he was furnishing hookah devices or equipment to consume the various smoking products on the premises. (McCullough Dec., Apx. p. 100 ¶ 12).

2.  McCullough attended a June 8, 2010 City of Allen Council workshop attended by a large crowd of people. A Police Department representative presented a PowerPoint presentation about

the dangers of K-2, and that the Police representative asserted that K-2 was potentially a dangerous substance and there was a need for regulation of K-2. The Police representative emphasized that because K-2 was not a regulated tobacco product, under-aged minors who could not buy tobacco products could instead buy and use the dangerous substance K-2. Jabary Hookah Lounge was across the street from the Allen High School and was close to the Ninth Grade School facility. (McCullough Dec., Apx. pp. 100-101 ¶¶ 14-15).

3.    One day after the Council meeting on June 9, 2010, McCullough was called to the Jabary Hookah Lounge while code enforcement officials were conducting a follow-up to the earlier May 27, 2010 inspection. The earlier May 27, 2010 inspection report listed critical violations including unsanitary conditions in the kitchen area, a lack of hand sanitizers anywhere on the premises, a lack of operating, unclogged hand-washing sinks, and unsanitary food preparation and cleanup areas in the kitchen. The May 27, 2010 inspection report did not note any spoiled or unexpired food on the premises. However, on June 9, 2010, other than canned or bottled beverages, all of the other food present appeared to be spoiled or expired or was not properly labeled. (McCullough Dec., Apx. p. 101 ¶ 17).

4.    McCullough personally spoke to Mr. Jabary and asked if he had food available for sale that had not expired and Mr. Jabary told Mr. McCullough that if wanted food, Jabary would go to the grocery, buy food, and then he would prepare the food for Mr. McCullough. The totality of circumstances existing on June 9, 2010 had deteriorated from the circumstances that existed earlier on May 27, 2010. While many of the same circumstances on May 27, 2010 continued to exist and had not been cured as Mr. Jabary had been ordered (Apx. p. 54), the fact that the food (other than packaged beverages) was spoiled or expired or unlabeled on June 9, 2010, together with Mr. Jabary's offer to buy fresh food and try to prepare it for sale certainly indicated deteriorated circumstances. Clearly, Mr. Jabary was willing to try to sell food even though the conditions of the kitchen did not include sanitary food preparation or cleanup areas, Mr. Jabary did not have hand sanitizer on the premises or functioning, unclogged hand-washing sinks. Despite this, Mr. Jabary was willing to prepare food in his unsanitary kitchen, with hands that he could not sanitize or wash, and then make that food available to Mr. McCullough. (McCullough Dec., Apx. p. 102 ¶ 20).

5.    The conditions McCullough faced on June 9, 2010 were unprecedented to him in his 25 years working in the code compliance field. The totality of circumstances he faced on that day included the fact that Mr. Jabary's business was not functioning as a restaurant as required by its Certificate of Occupancy, the business was selling tobacco, smoking products, incense, and K-2 to a clientele that was largely teenagers and young adults. One day earlier McCullough had attended a public presentation by the Police Department about the dangers of K-2, and learned that a common means of using K-2 was through burning it as incense or through a device like the hookah device Mr. Jabary furnished. (Apx. p. 39, p. 43). The kitchen of the so-called restaurant – which was actually not a restaurant – was unsanitary, there was no unspoiled or unexpired or unlabeled food on the premises (other than packaged beverages), and Mr. Jabary, the owner, expressed willingness to furnish fresh food prepared as a sandwich. Mr. Jabary made this offer even though there was no hand sanitizer he could use and there were no operable hand-washing sinks on the premises that he could use as he prepared and served food, and there was no sanitary or clean food preparation or cleanup area. The totality of circumstances reasonably caused McCullough to conclude that there was an immediate risk to the public health and safety and an immediate need to shut down the business rather than risk further delay involved in giving Mr. Jabary additional notice or the same facility conditions that previously existed continued to exist, and additional delay would occur by setting a hearing. Meanwhile, Mr. Jabary expressed a willingness to prepare and serve food under such conditions.

Therefore, Mr. McCullough thought it reasonable to immediately revoke the Certificate of Occupancy. (McCullough Dec., Apx. pp. 103-104 ¶ 24).

The code provision stated as a basis for revoking the Certificate of Occupancy was pursuant to the Table of Permitted Uses allowed under Land Development Code § 4.20.1 (Apx. pp. 23-25) (Yellow Tag Revocation Notice, Apx. pp. 2-3). Such conditions of the food and the kitchen reasonably appeared to McCullough to pose an immediate risk to public health and safety. (McCullough Dec., Apx. pp. 103-104 ¶ 24). To the extent that the condition and operation of the kitchen and food reasonably appeared to be potential immediate public health and safety hazards, advance notice and a hearing prior to revoking the Certificate of Occupancy was not required. Patel, 298 F.3d at 341. Again, the question is not whether there was actually a danger, but whether McCullough had reasonable grounds for thinking there was a danger. Patel, 298 F.3d at 341, citing Gilbert, 520 U.S. at 933. See also Herwins, 163 F.3d at 18; Elsmere Park Club, 542 F.3d at 418.

### 2.  Health & Safety Problems Regarding Product Being Sold – K-2

The Court should consider not only the health and safety hazards associated with operation of the Hookah Lounge as a pretend restaurant, but the Court should also take into account what was learned by McCullough one day earlier regarding materials being sold at the Hookah Lounge. McCullough stated that he was concerned that the business which was operating under a Certificate of Occupancy as a restaurant, was instead using the Certificate of Occupancy to engage in a different type of business, and that the business sold K-2. McCullough believed the Police Department's June 8, 2010 report (Apx. pp. 31-44) that K-2 was dangerous.

The business appeared to be primarily engaged in selling smoking products. Among the smoking products being sold was material that pretended to be "incense", but, according to Sgt. Felty, all of the "incense" was the dangerous product K-2. (Felty Dec., Apx. p. 80 ¶ 5). The DEA recognizes K-2 is often marketed as incense, and that K-2's active ingredients have no odor and no value as incense. (Apx. p. 60). This pretend "restaurant"/Hookah Lounge was locate across the street from

Allen High School, a short distance down the street from the Ninth Grade School, and many of its customers were teenaged people and people in their 20s. (McCullough Dec., Apx. p. 101 ¶ 15).

There is no doubt that the City of Allen Police Department and the City itself were proactive in taking action to ban the dangerous substance K-2 even before the federal Drug Enforcement Agency did so. (See Allen Code Article 4 – Illegal Smoking Products, Apx. pp. 56-58.) (Terrell Dec., Apx. p. 107 ¶ 13). The federal DEA took steps March 11, 2011 to ban the active ingredients in K-2. 76 Federal Register 11075 (March 1, 2011) (Apx. pp. 59-62). Findings by the DEA, contained in the Federal Register, repeatedly emphasized that the DEA determined a need to ban such substances, including the active ingredients in K-2, because of "an imminent hazard to the public safety" (Apx. p. 59). The information in the Federal Register indicates that the most common method of administering such substances is by smoking, including by using a water pipe – a hookah (Apx. p. 60). Plaintiff's Complaint describes his hookahs as a water pipe. (Doc. 167 p. 3 ¶ 8 fn 2).

The DEA once again declared the active ingredients in K-2 an imminent public health hazard, justifying its ban under temporary powers of the DEA on January 10, 2014. 70 Federal Register 1776 (Apx. pp. 63-67). The DEA has also published fact sheets regarding regulation of K-2 and describing use and dangers of K-2 (Apx. pp. 73-78). All of this information presented by the DEA after the revocation of the Certificate of Occupancy is consistent with the Power Point presentation made to the Allen City Council by the Allen Police Department, and to the number of citizens present on June 8, 2010 – the day before the Certificate of Occupancy was revoked. (Power Point presentation, Apx. pp. 31-44) (Officer Johnson Dec., Apx. pp. 84-85 ¶¶ 5-9) (Terrell Dec., Apx. p. 106 ¶¶ 7-9).

In very recent times, over four years later, widespread news media reports state that during the period from May 3, 2014 through May 5, 2014, 120 people in the State of Texas overdosed on K-2 originating in the Dallas area. (Apx. pp. 73-78, especially p. 77).[2] On June 9, 2010, there was certainly

---

[2] The news media reports are offered to show that K-2 is an ongoing matter of public concern and potential public danger, and the reports are consistent with the information that the DEA placed into the Federal Register first in 2011 (Apx. p. 60)

sufficient information to support a determination that the so-called "restaurant" was instead exactly what it calls itself - a Hookah Lounge – which marketed smoking products, including K-2, to teenagers and young adults. In fact, at the time, while a 15-year old might not be able to buy tobacco or a cigarette, he could instead buy K-2 from Mr. Jabary's business despite the known dangers and risks. McCullough knew Jabary was selling K-2 at his pretend restaurant. By June 8, 2010, McCullough knew that K-2 was a dangerous substance. Even if McCullough's focus at the time was on the health hazards associated with the kitchen and spoiled food, the Court should not ignore the indisputable fact that the Hookah Lounge was a place selling K-2, a known dangerous substance, and a known public health hazard. Even though K-2 had not become a banned substance in the City of Allen until a month later, that fact did not make K-2 any less dangerous. A public official should not be required to sit back and wait for 120 overdoses to occur when the public official knows that a business, which is not even operating properly under its Certificate of Occupancy, is selling substances that are known public health and safety hazards.

In a different context, but with factual and legal parallels, courts address situations in which Law Enforcement Officers sometimes make an arrest for one offense when the existing facts known to the Officer do not support probable cause for that arrest, but instead support probable cause for a different offense. Under those situations, even if the Officer incorrectly charges a person for one offense and uses that as a basis of the arrest, and does not even think of the other offense at the time the Officer makes his warrantless arrest, the arrest is not unconstitutional. See <u>Devenpeck v. Alford</u>, 543 U.S. 146, 153 (2004). In a situation involving a warrantless arrest based on probable cause, there is an immediate seizure of that person – a taking of his liberty – that is done without notice and a hearing. In the present case, even if McCullough's focus was on the conditions of the kitchen and the spoiled and expired food, he was certainly aware that the pretend restaurant was instead a different

---

and more recently January 10, 2014 (Apx. pp. 65-66) under heading Factor 4, Factor 5, and Factor 6 – reporting and discussing widespread adverse effects in various places throughout the country.

---

type of establishment selling a dangerous product – K-2. Therefore, the Court simply should not turn a blind eye to facts known to McCullough, known to the public, and known to Jabary.

### E.  Conclusion As To Issue No. 4

The dirty, inoperable kitchen with spoiled, inedible food was a sufficient basis justifying an immediate shutdown of Jabary's business. The business that was engaged in selling smoking products, under the guise of a restaurant, including K-2, a known dangerous substance also posed a danger to public health and safety. There was no violation of Jabary's procedural due process rights in connection with an immediate revocation of his Certificate of Occupancy. Therefore, as to the fourth issue to be decided – under the circumstances existing at the time the Certificate of Occupancy was revoked, was there a procedural due process violation committed? – The only answer the Court can reach is **NO**. There was no procedural due process violation.

### VIII.  ISSUE NOS. 5 & 6 – FAILURE OF SUBSTANTIVE OR SUBSTANTIAL DUE PROCESS CLAIMS
### A.  Identification of Claims

Plaintiff's Fourth Amended Complaint (Doc. 167) asserts two claims as so-called "Count IV Substantiative [*sic*] Due Process" and "Count V Chilling Effect Substantiative [*sic*] Due Process" (pp. 15-16 ¶¶ 68-78). Other than very minor wording changes, the two "Counts" are identical to the same Counts with the same labels as set forth in the Second Amended Complaint (Doc. 37 at pp. 16-18 ¶¶ 82-92). In fact, as an example of sloppy cut and paste work, both of the present Counts in Doc. 167 at paragraphs 68 and 73 state, "Paragraphs 1-102 are incorporated herein by reference." Of course, the Fourth Amended Complaint does not contain 102 paragraphs, but the Second Amended Complaint (Doc. 37) did include 102 paragraphs. At any rate, these substantive due process claims in the present Complaint are identical to the claims in the Second Amended Complaint.

### B.  The Conclusory Nature of the Claims Requires Dismissal

All of the individual Defendants moved to dismiss these two Counts three years ago because

the Counts were inadequately pled and did not show a violation. (Motion, Doc. 49 pp. 4-11) (Motion, Doc. 66 pp. 4-11.) This Court's Magistrate found that Plaintiff failed to state a plausible claim for relief as to all substantive due process claims against all individual Defendants (Doc. 78 p. 14). The District Court adopted the Report and Recommendation (Doc. 100). The District Court additionally adopted the Magistrate Court's Recommendation for Entry of a Final Judgment (Order, Doc. 118) and a final judgment dismissing these claims with prejudice as to all individual Defendants was issued August 27, 2012 (Doc. 119). The United States Court of Appeals for the Fifth Circuit squarely affirmed the dismissal with prejudice of all substantive due process claims against the individual Defendants. See Jabary v. City of Allen, 547 Fed. Appx. 600, 603-604, 611 (5th Cir. 2013). Under the law of the case, Plaintiff has failed to show that anyone he identified as having involvement committed a substantive due process violation, and therefore the claims fail as to the City. Barrow, 2007 WL 3085028 at p. 9; Free, 164 F.3d at 272. The Court need not further explore the meritless claims against the City, and the substantive due process claims should remain dismissed with prejudice.

## C. No Egregious Conscience Shocking Conduct

This case involves Plaintiff attempting to assert various claims, all based on the revocation of the Certificate of Occupancy for his business. Defendants have all detailed the reasons the Certificate of Occupancy was revoked, and this Court has already recognized that the circumstances facing Defendant McCullough were sufficient to serve as a reasonable basis for finding a public health emergency existed. (Report, Doc. 151 p. 17). Simply put, there was nothing that could be considered such arbitrary conduct that it would be considered egregious and would shock the conscience. Absent that type of showing, there simply is not a violation of Constitutional guarantees of substantive due process. County of Sacramento v. Lewis, 523 U.S. 833, 846 & 850 (1998). Unless such a showing could be made, there simply is no substantive due process claim. Moreover, in the context of a zoning type of dispute – which at heart this case includes, at least one court has recognized that it would be a

rare case indeed if a plaintiff can establish the elements of a substantive due process claim in a dispute over the types of City codes that are involved in a zoning case. Odlan Holdings v. City of New Orleans, 109 F.Supp.2d 503, 504-505 (E.D. La. 2000). For this additional reason, the substantive due process claims fail.

## IX.  CONCLUSION

For all the reasons stated herein, Plaintiff's claims against Defendant City of Allen fail and the Court should grant summary judgment dismissing all such claims with prejudice.

Respectfully submitted,

    /s/James T. Jeffrey, Jr.
**JAMES T. JEFFREY, JR.**
State Bar No.: 10612300
LAW OFFICES OF JIM JEFFREY
2214 Park Springs Blvd.
Arlington, Texas 76013
Phone No.: (817) 261-4640
Fax No.: (817) 275-5826
**ATTORNEY FOR CITY OF ALLEN**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing is being electronically filed and a copy electronically submitted to all counsel of record this 14th day of November, 2014 pursuant to the Eastern District Court's rules for electronic filing.

    /s/James T. Jeffrey, Jr.
**JAMES T. JEFFREY, JR.**